**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 3:21-cr-00045-MMD-CLB |
| Plaintiff, | |
| v. | **ORDER** |
| ALESSANDRA HORSE, | |
| Defendant. | |

Defendant Alessandra Horse challenges this Court's authority to detain her pending her supervised release revocation hearing, arguing that the Non-Detention Act, 18 U.S.C. § 4001(a), forbids detention absent statutory authorization. But the plain meaning of the Non-Detention Act—confirmed by the statutory history and purpose—restricts the detention power of the Executive, not the Judiciary. So, this Court's detention of Horse does not violate the Act.

**I.     BACKGROUND**

In 2022, Horse was convicted in the District of Nevada for Involuntary Manslaughter Within Indian Country and sentenced to 25 months prison, followed by a three-year term of supervised release. ECF No. 56. Horse's supervision began on April 24, 2023. *Id*. On February 22, 2024, a petition for a warrant was filed alleging Horse violated her supervised release. ECF No. 38. Horse was arrested and had her initial appearance on the petition on February 26, 2024. ECF No. 41. Horse submitted to detention and was detained pending her revocation hearing. *Id*. On March 19, 2024, Horse admitted to certain violations. ECF No. 51. In turn, the district court revoked her term of supervised release and sentenced Horse to 60 days in custody, with 24 months of supervised release to follow. *Id*.

On March 10, 2025, a second petition for a warrant was filed alleging numerous violations of Horse's supervised release conditions. ECF No. 56. Horse was arrested pursuant to a warrant. ECF No. 57. She made her initial appearance on June 11, 2025. *Id.* At that time, she argued she

1

could not be detained pursuant to the Non-Detention Act. This Court asked for briefing on the issue, which the parties submitted. ECF Nos. 60, 65, and 66. This Court resumed the detention hearing on June 17, 2025. ECF No. 67. It provisionally held it had authority to conduct the detention hearing and found that Horse failed to show by clear and convincing evidence that she was not likely to flee. *Id.*; ECF No. 77 at 11, 24–25. In turn, this Court asked for additional briefing on the applicability of the Non-Detention Act to the Judiciary, which the parties provided. ECF Nos. 81 and 82.

**II.   ANALYSIS**

In asserting that detention pending a supervised release revocation hearing violates the Non-Detention Act, Horse argues that numerous sources of statutory authority fail to provide courts with detention authority at this stage in the proceedings. ECF No. 60. The Government, in turn, asserts that certain statutes do provide detention authority. ECF No. 65. But as explained in more detail below, this Court finds the Non-Detention Act does not apply to the Judiciary. As a result, it need not address whether any of the statutory provisions relied on by the parties would satisfy the Act.

**A.   The Non-Detention Act does not restrain this Court's detention authority.**

Horse contends that detention pending her revocation hearing violates the Non-Detention Act because no statute provides this Court authority to detain her at this stage in the proceedings. ECF No. 60. But before turning to her arguments regarding statutory authorization, this Court must first determine whether the Non-Detention Act applies to the Judiciary in the first place. The Act provides:

> No citizen shall be imprisoned or otherwise detained by the United States except pursuant to an Act of Congress.

18 U.S.C. § 4001(a).

The Government asserts that the statute's applicability is limited to the Executive, whereas Horse maintains that it applies to the entire federal government. *Compare* ECF No. 82 *with* ECF No. 81. For the reasons discussed below, this Court finds that the Non-Detention Act's use of the

term "United States" refers to the Executive and thus does not restrain this Court's detention authority.

But before undertaking that analysis, this Court first addresses Horse's request that it refrain from considering whether the Non-Detention Act limits only the Executive's authority to detain a citizen absent congressional authorization. Horse contends that this Court's sua sponte consideration of this issue violates the "party presentation rule" and amounts to judicial advocacy on behalf of the Government, which, according to her, has already conceded that the Act applies to the Judiciary. ECF No. 81 at 1 n.1.

There is no doubt that our adversarial system "follow[s] the principle of party presentation." *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020). "[I]n both civil and criminal cases, in the first instance and on appeal. . . we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." *Greenlaw v. United States*, 554 U.S. 237, 243 (2008). At the same time, the "party presentation principle is supple, not ironclad," and there are "no doubt circumstances in which a modest initiating role for a court is appropriate." *Sineneng-Smith*, 590 U.S. at 376.

"When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991); *see also Thompson v. Runnels*, 705 F.3d 1089, 1098, 1099 n.4 (9th Cir. 2013) (same). "In short, parties present issues and claims for determination, not specific arguments or theories, and Supreme Court authority makes clear that we are not limited to the particular arguments raised by the parties in resolving the proper application of governing law." *Singh v. Garland*, 118 F.4th 1150, 1165 (9th Cir. 2024). To that end, this Court is free to "consider an issue antecedent to and ultimately dispositive of the dispute before it, even an issue the parties fail to identify and brief." *United States Nat. Bank of Oregon v. Independent Ins. Agents of Am., Inc.*, 508 U.S. 439, 447 (1993).

One of the issues before this Court is whether it may detain a defendant pending a supervised release revocation hearing in light of the Non-Detention Act. However, this Court is

3

not obligated to accept the Act's applicability without scrutiny—particularly if it questions whether the Act limits only the authority of the Executive, and not that of the Judiciary. It is well within this Court's authority to "apply the proper construction of governing law." *Kamen*, 500 U.S. at 99. Far from acting as "an advocate for the Government," this Court simply recognized the need to evaluate, as a threshold matter, whether the Non-Detention Act applies at all. In doing so, it afforded both parties ample opportunity to brief the issue.

Having considered the parties' supplemental briefs, this Court concludes that the Non-Detention Act does not restrain the Judiciary. Thus, it plays no role in determining whether Horse may be detained pending her revocation hearing.

### 1. The term "United States," by its plain meaning, refers to the Executive, not the Judiciary.

To discern the statute's meaning, this Court's analysis begins with the text. *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 299 (2017). The operative language of § 4001(a) is the phrase "by the United States." As Horse recognizes, this prepositional phrase connotes an affirmative action taken by the "United States," and thus the "United States" must perform the detention for the Non-Detention Act to apply. *See Haley v. Kolbe & Kolbe Millwork Co.*, 866 F.3d 824, 831 (7th Cir. 2017) ("[A] phrasal preposition . . . is used to indicate a relationship between an object and its antecedent."). Because the statute does not define "United States," this Court must look to the statute as a whole—considering both text and statutory context—to determine the term's meaning. *United States v. Lillard*, 935 F.3d 827, 834 (9th Cir. 2019) (citations omitted).

Horse first points to dictionary definitions in urging this Court to interpret the "United States" as encompassing the entire federal government. ECF No. 81 at 3. But while dictionary definitions "bear consideration, they are not dispositive of the meaning" of a term. *Yates v. United States*, 574 U.S. 528, 538 (2015). This is because "[i]n law as in life. . . the same words, placed in different contexts, sometimes mean different things." *Id.* at 537.

For this same reason, Horse's references to the meaning of "United States" in other constitutional clauses and statutory contexts are unpersuasive. *See* ECF No. 81 at 3. "[I]dentical language may convey varying content when used in different statutes, sometimes even in

4

different provisions of the same statute." *Yates*, 574 U.S. at 538. And Horse's comparisons all use "United States" as a geographical and jurisdictional contrast to other sovereign entities. *See, e.g.*, U.S. Const. art. VI, cl. 3 (distinguishing between federal and state governments); U.S. Const. art. IV, § 3, cl. 2 (same); U.S. Const. amend. XV, § 1 (same); U.S. Const. amend. XIX (same); U.S. Const. amend. XXIV, § 1 (same); 18 U.S.C. § 4111 (distinguishing between the United States and foreign countries). Its meaning in these instances, therefore, does not illuminate its meaning in the statute at hand.

While this Court agrees with Horse that Congress's choice to use more exacting language in other statutory contexts may shed light on the meaning of "United States" here, this very reasoning cuts against her interpretation. The constitutional and statutory provisions she points to do not operate within the same context as the statute at hand, nor do they cover similar subject matter. *See* ECF No. 81 at 4–5. Yet, in examining other statutes that restrain a court's detention authority during a federal criminal case, Congress notably used distinct language. Throughout the provisions of the Bail Reform Act, Congress used the term "judicial officer." 18 U.S.C. § 3141 et seq. That difference carries meaning. *See Cheneau v. Garland*, 997 F.3d 916, 920 (9th Cir. 2021) (en banc) ("language of related or similar statutes" help "aid in interpretation.") (citation omitted).

In the context of the federal criminal system, the "United States" has a distinct, technical definition. The United States—through the Department of Justice—is a party to this case. Thus this Court, by virtue of a case's component parties, cannot be the "United States." Though the United States *moves* for detention, this Court is the entity committing the affirmative action of *detaining* the defendant. Section 4001(a) does not restrict the "court," the "judge," the "magistrate judge," the "judicial officer," or the "Judiciary." It restrains the "United States," which, in the context of the federal criminal system, is the Executive.

Congress's placement of the Non-Detention Act in title 18 further supports this interpretation. In passing the Act, Congress explicitly directed placement in § 4001, which is located in part III, titled "Prisons and Prisoners." Pub. L. No. 92-128. Horse is correct that statutes within part III do not simply impact executive branch detainees; they affect those who are incarcerated in federal facilities due to judicially authorized detentions as well. ECF No. 81 at 5–

6. But the powers prescribed and the restrictions imposed by the statutes in part III govern the Executive, mainly in the form of the Attorney General and Bureau of Prisons.

By contrast, statutes governing the courts, counsel, parties, witnesses, and other entities involved in criminal proceedings are found in part II, titled "Criminal Procedure." Because § 4001(a)'s key phrase "by the United States" connotes affirmative conduct by whichever entity constitutes the "United States," the mere fact that judicially authorized detainees ultimately are held in federal carceral facilities does not indicate that Congress intended to restrain the Judiciary's detention authority through this provision.[1] It is unlikely that Congress would have buried a broad prohibition on a court's detention power among neighboring provisions that regulate the Attorney General (subsections (b)(1) and (2)) and within a chapter that oversees the Executive's control of federal prisons. *See Yates*, 574 U.S. at 540–41, 546 (Congress's placement of provision among other specialized provisions in the U.S. Code evidenced narrow construction of term). Thus, "United States," by its plain meaning, refers to the Executive.

### 2. *The Non-Detention Act's statutory history and purpose confirm this plain meaning.*

If there was any question as to the plain meaning of the term "United States" in § 4001(a), the statutory history and purpose of the Non-Detention Act confirm that it solely restrains the Executive's detention authority. *See Wooden v. United States*, 595 U.S. 360, 371–76 (2022) (discussing "statutory history and purpose," including amendments and legislative history, in confirming plain meaning). The Non-Detention Act repealed Title II of the Internal Security Act

---

[1] *Howe v. Smith* is not inconsistent with this holding. 452 U.S. 473 (1981). The state prisoner in *Howe* challenged the authority of the Attorney General and the BOP to imprison him in a federal facility pursuant to a statute authorizing prisoner transfers. *Id.* at 479. In challenging the Attorney General and BOP's approval of his transfer—an affirmative act causing his federal imprisonment—he challenged detention *by the United States*. *See id.* at 479 n.3.

Similarly, the fact that the proper respondent in a habeas petition is the facility's custodian is not indicative of § 4001(a)'s supposed applicability to all judicially authorized detainees who end up in federal facilities. *See* ECF No. 81 at 10–12. The custodian is the proper respondent because he "is 'the person' with the ability to produce the prisoner's body before the habeas court." *Rumsfeld v. Padilla*, 542 U.S. 426, 435 (2004).

6

of 1950, which was commonly known as the "Emergency Detention Act."[2] Pub. L. No. 92-128. The Emergency Detention Act vested broad detention powers in the Executive upon the President's declaration of an "internal security emergency":

> Wherever there shall be in existence such an emergency, the President, acting through the Attorney General, is hereby authorized to apprehend and by order detain each person as to whom there is reasonable ground to believe that such person may engage in, or may conspire with others to engage in, acts of espionage or of sabotage.

50 U.S.C. §§ 812–13 (1952) (repealed 1971). The detention procedures were governed entirely by the Executive branch: the Attorney General or designated DOJ officers would issue and serve warrants, detainees would be confined in locations designated by the Attorney General, detainees would be entitled to a preliminary hearing before an officer appointed by the President, and the Detention Review Board (created by the President) would evaluate any detainees' petitions for review. *Id.* §§ 814–15.

Though no president ever invoked the Emergency Detention Act, Congress ultimately repealed it nearly 20 years later. Pub. L. No. 92-128. "Congress was particularly concerned about the possibility that the Act could be used to reprise the Japanese American internment camps of World War II." *Hamdi v. Rumsfeld*, 542 U.S. 507, 517 (2004) (citing H.R. REP. NO. 92-116, at 4–5 (1971)). In the lead up to the Non-Detention Act's passage, several bills aimed at prohibiting detention camps emerged. One version simply repealed the Emergency Detention Act. S. 1872, 91st Cong. (1969). Another amended it to add protections for detainees and prohibit detention based on race and ancestry. H.R. 820, 92nd Cong. (1971). The last version—which ultimately became law—not only repealed the Emergency Detention Act, but also added a further restriction on the creation of detention camps. H.R. 234, 92nd Cong. (1971).

Rather than merely repealing the Emergency Detention Act, Congress inserted the § 4001(a) language out of concern that simply striking down the law would return Executive authority to that of World War II, where Japanese American internment was carried out by

---

[2] The Emergency Detention Act was previously codified at 50 U.S.C. §§ 811–26.

7

Executive order. H.R. REP. NO. 92-116, at 5 (1971) ("Repeal alone might leave citizens subject to arbitrary executive action, with no clear demarcation of the limits of executive authority."); 117 Cong. Rec. 31551 (1971) (statement of Rep. Thomas Railsback) ("in order to prohibit arbitrary executive action, [the bill] assures that no detention of citizens can be undertaken by the Executive without prior consent of the Congress."). "It was in these circumstances that a proposed limit on Executive action" was incorporated into "§ 4001(a) as enacted." *Hamdi*, 542 U.S. at 543 (Souter, J., joined by Ginsberg, J., concurring) (discussing purpose of repeal plus amendment).

Horse is correct that a prior version of the bill swept more broadly by prohibiting detention "except in conformity with the provisions of title 18." H.R. 234, 92nd Cong. (1971) (as reported by H. Comm. on the Judiciary). But she ignores, crucially, that the Judiciary Committee modified the bill's language in response to the DOJ's concerns that the provision could inadvertently undermine existing detention practices that were not the target of the bill. The DOJ objected to the language because such wording wrongly assumed that all detention provisions were contained in title 18. Prohibiting Detention Camps: Hearings Before the H. Comm. on the Judiciary, 92nd Cong. 73 (1971) (statement of Robert C. Mardian, Asst. Att'y Gen., Internal Sec. Div.). To assuage the DOJ's concerns, Committee members suggested that the bill be amended "to make it clear there is an affirmative prohibition on the executive branch from opening up any kind of detention camps" and "that [they] were not repealing any other detention provisions." *Id.* at 77 (statement of Rep. Abner Mikva).

The Judiciary Committee removed this prior provision and substituted the current language of § 4001(a) to make clear that the Non-Detention Act solely restricts the Executive. H.R. REP. NO. 92-116, at 5 (1971)). And as the Government points out, the purpose of this amendment is well-documented. Representative Railsback, the bill's sponsor, explained the addition of the § 4001(a) language, which was then coined the "Railsback Amendment":

> My amendment has no intention to affect the present operation of the criminal law in any way. It does only one thing: It takes from the Executive whatever authority he would have in the absence of statute to detain citizens in camps. . . My amendment does not affect the criminal law. It does not affect. . . judicial

8

> detention, such as that upon the denial of bail or that following contemptuous conduct.

117 Cong. Rec. 31550 (1971) (statement of Rep. Thomas Railsback). This purpose was echoed by many others in Congress, including a fellow Judiciary Committee member,[3] a sponsor of a prior version of the bill,[4] and the senator who sponsored the first bill proposing repeal of the Emergency Detention Act.[5]

The history of the Non-Detention Act thus aligns with the plain meaning discerned above as well as the circumstances in which the Supreme Court and the Ninth Circuit have dealt with the statute before, which purely concerned the Executive branch. *See, e.g.*, *Hamdi*, 542 U.S. 507 (challenge to actions by the President as Commander in Chief of the military); *Rumsfeld v. Padilla*, 542 U.S. 426 (2004) (same); *Howe v. Smith*, 452 U.S. 473 (1981) (challenge to actions by the Attorney General and BOP); *Flores-Torres v. Mukasey*, 548 F.3d 708 (9th Cir. 2008) (challenge to actions by ICE). And as the Government notes, such an interpretation makes sense of Congress's choice to distinguish based on citizenship: Congress meant to preclude another episode akin to the World War II internment of *citizens* of Japanese ancestry. 117 Cong. Rec. 31762 (1971).[6] Such interpretation, therefore, is an understandable feature of a provision

---

[3] "It is not the committee's intent to eliminate any detention practices presently authorized by statute or judicial practice and procedure. . . Detentions incident to judicial administration such as those authorized by the judicial authority to maintain order in a courtroom, judicial contempt powers, and the judicial authority to revoke bail or parole, are not within the intendment of the committee's amendment. Certainly, the committee does not propose that detentions presently permitted in the normal course of law enforcement and judicial administration be influenced in any way." 117 Cong. Rec. 31541 (1971) (statement of Rep. Richard Poff).

[4] "The purpose of the positive language is to forestall action, by the Executive, for the wholesale detention of a group of persons arbitrarily determined to be a danger to the United States." *Id.* at 31770 (statement of Rep. Orval Hansen).

[5] "I believe that this provision is a valuable addition to my bill and hope that the Senate will adopt it. I would like to emphasize that this House provision should be viewed in no way granting authority to eliminate any detention practices now authorized by statute, judicial practice or procedure, such as. . . judicial authorization to revoke bail or parole, or to detain those so as to maintain order in a courtroom." *Id.* at 32145 (statement of Sen. Daniel Inouye).

[6] In a colloquy on the House floor, Representative Yates questioned Representative Railsback about his amendment:

> In other words, there could not be the same kind of executive action that was undertaken by President Roosevelt in his Executive order of detention of the more

9

intended to circumscribe Executive detention authority in times of national security emergency. *See Hamdi*, 542 U.S. at 517.

If recourse to traditional tools of statutory construction left any doubt as to the interpretation of "United States" (it does not), the constitutional avoidance canon resolves the question in favor of § 4001(a) restricting the Executive. *See Clark v. Martinez*, 543 U.S. 371, 381 (2005) (constitutional avoidance canon "rest[s] on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts."). Categorically excluding citizens—but not noncitizens—from detention pending revocation would raise questions regarding its constitutionality vis a vis the Equal Protection Clause. And the Ninth Circuit has made clear that in the context of other judicially authorized detentions, lack of citizenship, in and of itself, is not a determinative factor in a defendant's eligibility for release. *United States v. Diaz-Hernandez*, 943 F.3d 1196 (9th Cir. 2019) (reiterating that alienage is not dispositive because a district court cannot substitute a categorical denial of bail for the required individualized evaluation). For all these reasons, this Court finds that § 4001(a) does not restrain the detention power of the Judiciary.

**B. Rules 32.1(a)(6) and 46(d) and the Rules Enabling Act**

Horse argues, for the first time in her supplement, that even assuming the Non-Detention Act is inapplicable, this Court cannot rely on Rules 32.1(a)(6) and 46(d) as authority for detention. ECF No. 81 at 12–13. Horse argues that doing so would violate the Rules Enabling Act as these rules would abridge her substantive right to "remain free from detention absent statutory authority." *Id.* at 12.

First, it is not clear why this Court would have no other option than to rely exclusively on Rules 32.1(a)(6) and 46(d) as the authority for detention. But assuming that were the case, Horse

---

> than 100,000 Japanese Americans at the time without there having been an act of Congress. Is that the purpose of the gentleman's amendment?

*Id.* at 31762 (statement of Rep. Sidney Yates). To which Representative Railsback replied:

> That is exactly right. It applies to citizens. It does not affect what can be done with enemy aliens. It applies to American citizens.

*Id.* (statement of Rep. Thomas Railsback).

does not quite develop how this right to "remain free from detention absent statutory authority" is a substantive right in the supervised release context.[7] In this same vein, there is no discussion of what governmental interests (rational, important, compelling, or otherwise) may be at play and whether these outweigh Horse's individual liberty interests. Nor is there a framework provided for determining whether a rule violates the Rules Enabling Act.

In short, the argument is not sufficiently developed and, moreover, the Government has not had an opportunity to brief the issue. Accordingly, this Court will limit its analysis to the question it initially set out to resolve: whether the Non-Detention Act forbids Horse's detention. The Court finds that it does not.

**CONCLUSION**

**IT IS THEREFORE ORDERED** that this Court's provisional finding that the Non-Detention Act does not restrict the Judiciary's detention authority is **AFFIRMED**.

DATED this 15th day of July 2025.

							_____
							BRENDA WEKSLER
							UNITED STATES MAGISTRATE JUDGE

---

[7] Post *United States v. Salerno*, there is no doubt that the right to liberty can be constrained without violating substantive due process rights given the compelling interests at play. 481 U.S. 739 (1987). It is not clear why this finding would not extend—with even more force—to the ambit of post-conviction, where a defendant has already been found guilty of having violated the law and is serving a period of supervised release.